268 N.J. Super. 403 (1993)
633 A.2d 1017
IN THE MATTER OF THE APPLICATION OF THE COUNTY OF BERGEN, NEW JERSEY, FOR APPROVAL TO DISSOLVE THE BERGEN COUNTY UTILITIES AUTHORITY.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1993.
Decided November 30, 1993.
*404 Before Judges PETRELLA, CONLEY and VILLANUEVA.
Stephen P. Sinisi argued the cause for appellant Bergen County Utilities Authority (Sinisi, Van Dam & Sproviero, attorneys; Mr. Sinisi and Scott G. Sproviero, on the brief).
Michael A. Lampert argued the cause for respondent County of Bergen (McManimon & Scotland, Special Counsel; and Elizabeth Randall, County Counsel, attorneys; Barbara Parker and Steven J. Reed, of counsel; Ms. Randall and Mr. Lampert, on the brief).
*405 Fred DeVesa, Acting Attorney General, attorney for respondent Local Finance Board (Daniel P. Reynolds, Deputy Attorney General, on the statement in lieu of brief).
PER CURIAM.
This is an appeal by the Bergen County Utilities Authority (BCUA) from a decision of the Local Finance Board (LFB), in the Department of Community Affairs, which approved an application submitted by the County of Bergen (Bergen) pursuant to N.J.S.A. 40A:5A-20 for the dissolution of the BCUA.
The BCUA argues that (1) the LFB erred in failing to declare the dissolution application a contested case and improperly proceeded with the dissolution hearing without first referring the case and the alleged attorney conflict of interest issue to the Office of Administrative Law (OAL); (2) Bergen's special counsel should have been disqualified from representing Bergen in this matter due to that firm's past representation of the BCUA, as it represents either a conflict of interest or, at least, a clear appearance of impropriety; (3) the LFB failed to consider whether Bergen adequately provided for the payment of the BCUA's creditors or obligees and for the assumption of necessary services presently provided by the BCUA; and (4) the LFB failed to set forth adequate findings and to endorse properly the bond ordinance, as required by N.J.S.A. 40A:2-7(d).

I.
The Bergen County Board of Chosen Freeholders (Freeholders) created the Bergen County Sewer Authority on February 19, 1947. The Freeholders reorganized this authority on March 1, 1978, and renamed it the BCUA. This entity now provides portions of Bergen with water, sewer, and solid waste services and holds the necessary permits, licenses, and approvals issued by the appropriate federal and state agencies to perform these functions.
On February 8, 1993, Bergen's county executive notified the BCUA that he had appointed a review team to investigate it. He *406 also requested documents concerning the BCUA's operations. On March 3, 1993, Bergen announced its plan to dissolve the BCUA.[1] The Freeholders introduced nine ordinances on March 24, 1993, relating to the dissolution, and adopted resolutions authorizing the filing of a dissolution application with the LFB. Further, the Freeholders approved certain filings with the Department of Environmental Protection and Energy (DEPE) and also other agencies concerning the transfer of the BCUA's service responsibilities to Bergen and a new authority known as the Bergen County Improvement Authority (BCIA). Bergen submitted its dissolution application to the LFB on March 29, 1993, and supplemented it shortly thereafter. Bergen also provided the BCUA with a copy of the application.[2]
On March 25, 1993, the Division of Solid Waste Management in the DEPE informed Bergen that it would cooperate in Bergen's plan to change the entities for "wastewater and solid waste functions, and the transfer of all applicable licenses, permits, certificates, and other related matters consistent with the applicable laws."
The LFB held a public hearing on April 20, 1993, regarding the dissolution application at which various Bergen representatives made presentations. Mr. McManimon, Special Counsel for Bergen, who was a principal in the law firm that previously acted as bond counsel not only for Bergen but also for the BCUA, presented the dissolution proposal. The county executive and the freeholder chairman discussed the underlying policy and management reasons for implementing the plan. In addition, a financial expert, *407 an engineering expert, and an accounting expert made presentations. A representative of the DEPE discussed, among other things, the permit and license requirements.
The LFB provided the BCUA with a full opportunity to present evidence and state its objections at this hearing. Several individuals did indeed participate on behalf of the BCUA, including its executive director, attorneys, and bond counsel. Various legislators also spoke on behalf of the BCUA. In addition, the BCUA presented a financial analyst and a former LFB chairman  each discussed the financial aspects of the plan.
More specifically, the BCUA had asserted that the LFB should not proceed because of an alleged attorney conflict of interest. The then law firm of Kraft & McManimon, now McManimon & Scotland, was the BCUA's bond counsel. Hence, the BCUA took the position that the bond transactions that the McManimon firm previously represented it on were substantially related to the transaction that Bergen wished to undertake in dissolving the BCUA. The BCUA sought the disqualification of the law firm. The LFB decided to refer that issue to the OAL.[3] After deciding to transfer that particular issue, the LFB continued to conduct the hearing and approved the dissolution application on that date pursuant to N.J.S.A. 40A:5A-20 and N.J.S.A. 40A:2-7(d). The Freeholders adopted appropriate dissolution ordinances on April 21, 1993. On that same date, this court denied the BCUA's request for a stay of implementation of the dissolution plan.[4] It filed a notice of appeal on May 7, 1993.

II.
We deal preliminarily with the conflict of interest issue. We preface our discussion by indicating that, although there is *408 merit in the BCUA's argument on this point, any violation of the rules of professional responsibility has not tainted the LFB proceedings to date and does not affect the dissolution decision.
The BCUA essentially argues that because an alleged conflict of interest existed between Bergen's special counsel and the BCUA, the LFB should have resolved that issue before proceeding on the dissolution application. The BCUA, however, never presented the matter to any Supreme Court committee nor did it seek relief in the courts. Instead, the BCUA had essentially asked an administrative agency in the executive branch of government to make a determination with respect to the practice of law, a matter peculiarly subject to the jurisdiction and control of the New Jersey Supreme Court and which all courts are responsible for enforcing. Of course, if the agency acted in a quasi-judicial fashion, it would be expected to apply the same principles as a court would apply when a judicial question arises. See Linden Merchants Association v. Linden City Council, 214 N.J. Super. 33, 41, 518 A.2d 245 (Law Div. 1986). Even considering, arguendo, for purposes of this specific issue only, that the LFB had been acting in a quasi-judicial capacity, see Jersey City v. Department of Civil Service, 57 N.J. Super. 13, 45, 153 A.2d 757 (App.Div. 1959), such an administrative agency does not have the final word on attorney conflict of interest problems and compliance with the Rules of Professional Conduct. Our Rules of Professional Conduct are stringently enforced, and would even appear to be stricter than those of other states. See, e.g., First Wisconsin Mortgage Trust v. First Wisconsin Corp., 584 F.2d 201 (7th Cir.1978) (en banc). In any event, the issue is not whether the LFB had an obligation to transfer the conflict question to the OAL, but whether or not a conflict of interest existed.[5]
An illustrative case is Reardon v. Marlayne, Inc., 83 N.J. 460, 416 A.2d 852 (1980), where defendant General Motors obtained a *409 disqualification order of plaintiff's attorney in a product liability case. The attorney had been previously employed by a law firm that represented General Motors and, in fact, had worked on similar cases in defense of General Motors. The Court stated in Reardon:
[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. [Id. at 472, 416 A.2d 852 (citation omitted).]
The Court further reasoned:
[A] substantial relationship between matters will exist where the "adversity between the interests of the attorney's former and present clients ... has created a climate for disclosure of relevant confidential information." Disqualification is mandated where the issues between the former and present suits are practically the same or where there is a "patently clear" relationship between them. However, the lack of identity between the cases will not pose a barrier to disqualification when grounds sufficient to show an appearance of impropriety are present. [Ibid. (citations omitted).]
The Court summarized with a three-part test that must be satisfied prior to disqualifying counsel:
(1) a prior attorney-client relationship between the former client and the attorney sought to be disqualified;
(2) a substantial relationship or a reasonable perception, from the public's perspective, of a substantial relationship between the subject matter of the present suit and that of cases worked on during the former representation;
(3) access to relevant confidences of the former client, which may be proven by other than direct evidence, leading to a conclusive presumption of the attorney's knowledge of such confidences. [Id. at 474, 416 A.2d 852.]
Our cases clearly indicate "that an attorney should avoid even the appearance of impropriety which may arise when he acts as an adversary against a former or existing client." In re Opinion No. 415, 81 N.J. 318, 323, 407 A.2d 1197 (1979). An appearance of impropriety, however, "is not to be determined in a vacuum ... [and] `must have some reasonable basis' and `must be something more than a fanciful possibility.'" Id. at 325, 407 A.2d 1197 (quoting Higgins v. Advisory Committee on Professional Ethics, 73 N.J. 123, 129, 373 A.2d 372 (1977).
*410 In our view, the continued representation of Bergen in these dissolution matters, even if not a clear conflict of interest, creates the appearance of impropriety under our Rules of Professional Conduct. See Reardon, supra, 83 N.J. at 472, 416 A.2d 852; In re Opinion No. 415, supra, 81 N.J. at 323-324, 407 A.2d 1197; RPC 1.9(a)(1) and (2). See also RPC 1.10(a) and (b); RPC 1.7.
The record here does not disclose any past violation of the rights of the respective clients. Nevertheless, the potential for use of information obtained by bond counsel, which presumably had full access to the BCUA's files and records and was even required to conduct internal audits in connection with its due diligence activities so as to satisfy the financial community, the public, and the BCUA, now stands in a position where the appearance of impropriety requires that it no longer represent Bergen. Our ruling, which disqualifies Bergen's special counsel as to BCUA matters, is prospective only. Accordingly, the firm of McManimon & Scotland is disqualified from representing Bergen any further in this or in any matter or proceeding in which Bergen has an adversary position with the BCUA.

III.
We turn now to the issue of the nature and necessity of the hearing, and the adequacy of the proceedings conducted by the LFB in this matter. Even though this court deems the LFB's role as essentially quasi-legislative, we would still affirm the decision even under the higher standard imposed upon quasi-judicial hearings.
The role of this court is limited in reviewing administrative agency decisions. "Ordinarily, an appellate court will reverse the decision of the administrative agency only if it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-580, 410 A.2d 686 (1980) (citing Campbell v. Department of Civil Service, 39 N.J. 556, 562, 189 A.2d 712 (1963)). See Newark v. Natural Resource Council in Dept. of *411 Environmental Protection, 82 N.J. 530, 541-542, 414 A.2d 1304 (1980) (citation omitted), cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980) ("Where `there is any fair argument in support of the course taken by the agency or any reasonable ground for difference of opinion[,] ... the decision will not be disturbed unless patently corrupt, arbitrary, or illegal.'").
Further, "[a]rbitrary and capricious action of [an administrative agency] means willful and unreasoning action, without consideration and in disregard of the circumstances. Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." Bayshore Sewerage Co. v. Dept. of Environmental Protection, 122 N.J. Super. 184, 199, 299 A.2d 751 (Ch.Div. 1973), aff'd, 131 N.J. Super. 37, 328 A.2d 246 (App.Div. 1974).
The Local Authorities Fiscal Control Law (Fiscal Law), N.J.S.A. 40A:5A-1 to -27, enacted in 1983, vests in the LFB "the power to oversee the creation, financing, and dissolution of local authorities." Browning-Ferris v. City of Passaic, 116 N.J. 83, 92-93, 560 A.2d 1208 (1989). The Fiscal Law sought to "promote the financial integrity and stability of local authorities ... by providing for State review of project financing of local authorities and for State supervision over the financial operations of local authorities." N.J.S.A. 40A:5A-2. The clear intent of the Fiscal Law was to "`strengthen the credit standing of municipalities, counties, and independent financing authorities,' thus providing increased assurances concerning the financial integrity of local authorities, thereby increasing the overall attractiveness of their obligations within the financial community." Stone v. Old Bridge Tp., 111 N.J. 110, 120, 543 A.2d 431 (1988) (citation and footnote omitted).
The Fiscal Law establishes two procedures for dissolving an existing local authority: (1) N.J.S.A. 40A:5A-21, due to financial difficulties or mismanagement; and (2) N.J.S.A. 40A:5A-20, upon passage of an ordinance by the municipality or a resolution *412 adopted by a county. Specifically, N.J.S.A. 40A:5A-20 provides in pertinent part:
Notwithstanding the provisions of any other law to the contrary, the governing body of a local unit which has established an authority shall have the power and is authorized by ordinance in the case of a municipality, and ordinance or resolution, as appropriate, in the case of a county, to dissolve the authority, except that the ordinance or resolution, as the case may be, shall be approved by the Local Finance Board prior to adoption.... The Local Finance Board shall approve the dissolution if it finds that the ordinance or resolution makes adequate provision in accordance with a bond resolution or otherwise for the payment of all creditors or obligees of the authority and that adequate provision is made for the assumption of those services provided by the authority which are necessary for the health, safety and welfare of the recipients of those services.
"It is clear from this statutory framework that the Legislature intended that local authorities, indebted by interim financing or permanent bonding, may be dissolved only under carefully circumscribed instances." Howell Tp. v. Manasquan River Regional, 215 N.J. Super. 173, 180, 521 A.2d 858 (App.Div. 1987).
In In re Township of Howell, 254 N.J. Super. 411, 603 A.2d 959 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991), the authority argued that the board's failure to consider the financial impact upon the ratepayers of the proposed dissolution violated N.J.S.A. 40A:5A-20. We rejected the authority's contention and agreed with the Administrative Law Judge (ALJ), reasoning that "this objection (along with several others), whether or not meritorious, [was] irrelevant because the focus of the inquiry under N.J.S.A. 40A:5A-20 is a `relatively narrow one,' namely, whether the Township made adequate provision for the payment of creditors and for the assumption of necessary services." Id. at 417, 603 A.2d 959.
The Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -21, defines a contested case as:
[A] proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing....
[N.J.S.A. 52:14B-2(b); N.J.A.C. 1:1-2.1]
*413 As stated in J.E. on Behalf of G.E. v. State, 131 N.J. 552, 562, 622 A.2d 227 (1993):
[T]he statute guarantees a trial-type hearing for those proceedings in which the legal rights and duties of specific parties are required by statute or constitutional right to be determined by an agency.
Although "adjudicatory hearings" are what the APA calls "contested cases" (N.J.S.A. 52:14B-2(b)), the terms are not coextensive. Texter v. Human Services Dept., 88 N.J. 376, 384, 443 A.2d 178 (1982). "Contested cases are those in which the Constitution or a statute requires an adjudicatory hearing. Adjudicatory hearings may be granted at the discretion of the agency in other circumstances." Ibid. In Spalt v. New Jersey DEP, 237 N.J. Super. 206, 212, 567 A.2d 264 (App.Div. 1989), certif. denied, 122 N.J. 140, 584 A.2d 213 (1990), we said "[t]he APA only prescribes the procedure to be followed if the right to a hearing is required by statute or the constitution. It does not in itself establish the right to a hearing."
Here, the LFB is not determining the legal rights, duties, obligations, privileges, benefits or other relations of the BCUA under any constitutional or statutory right. The BCUA has no legal right not to be dissolved if Bergen complies with N.J.S.A. 40A:5A-20.
Nor does the BCUA cite any statutory or constitutional authority that requires the LFB to afford it a hearing as a contested case prior to dissolution by the very governmental entity that had created it. Instead, it mistakenly relies upon Howell, supra, 254 N.J. Super. 411, 603 A.2d 959, as a claimed constitutional basis for deeming this matter a contested case. In Howell, we were faced with the situation where the township sought to dissolve its municipal authority and sought approval from the LFB under N.J.S.A. 40A:5A-20. At the authority's request, the matter was transferred to the OAL as an uncontested case. An ALJ conducted hearings and concluded that the township had complied with the statute and the LFB adopted those findings and approved the dissolution.
*414 On the authority's appeal, this court rejected an argument by the township that the authority lacked standing. We did not, however, create a constitutional or statutory right in a public authority to have a hearing prior to its dissolution, but merely recognized that it had standing to challenge the LFB's decision. Absent statutory or constitutional provision, the BCUA has no right to a hearing. See, e.g., In the Matter of the Department of Environmental Protection Decision on Application of Triarch Corp., 139 N.J. Super. 514, 516, 354 A.2d 652 (App.Div. 1976) ("The Wetlands Act of 1970 ... does not require that a hearing be afforded in connection with an application for a wetlands permit."); Board of Education v. State Board of Education, 172 N.J. Super. 547, 551, 412 A.2d 1320 (App.Div. 1980) (School board's contention that its CAP waiver application constituted a contested case was rejected; the matter was considered quasi-legislative rather than quasi-judicial.). We therefore reject the BCUA's contention that the LFB should have transferred this matter as a contested case to the OAL.
Even if we assume, however, that the matter constituted a contested case, the LFB still had the authority to render a final decision by conducting its own hearing, rather than transmitting it to the OAL. This type of matter differs from professional licensing situations where individual vested rights are implicated. See Limongelli v. State Board of Dentistry, 260 N.J. Super. 346, 616 A.2d 945 (App.Div. 1992), certif. granted, 133 N.J. 433, 627 A.2d 1139 (1993).
Moreover, an agency head has the exclusive authority to decide contested cases. Thus, the agency is not required to transfer the matter to the OAL or adopt any of the ALJ's findings or conclusions. Matter of Kallen, 92 N.J. 14, 20, 455 A.2d 460 (1983). Various statutory provisions grant an agency head final decision-making power. In N.J.S.A. 52:14B-10(c), the agency head is given authority to "adopt, reject or modify" an ALJ's recommended report and decision. N.J.S.A. 52:14F-7(a) provides:

*415 a. Nothing in this amendatory and supplementary act shall be construed to deprive the head of an agency of the authority pursuant to section 10 of P.L. 1968, c. 410 (C. 52:14B-10) to determine whether a case is contested or to adopt, reject or modify the findings of fact and conclusions of law of any administrative law judge.
In addition, N.J.S.A. 52:14F-8(b) prohibits an ALJ from hearing a contested case where the agency head has determined to conduct the hearing.
In any event, here, the LFB afforded the BCUA ample opportunity to be heard. Indeed, the BCUA vigorously and forcefully set forth its assertions and concerns at the April 20 hearing. It not only had ample opportunity to appear and address all issues involved, but the LFB granted it an opportunity to rebut. As noted, even if this had been deemed a contested case, the LFB did not have to transfer it to the ALJ and, even if it did, it did not have to accept the ALJ's initial decision.
Our review of the record leads us to conclude that the agency's determination complied with the applicable procedural requirements and the statutory authorization in N.J.S.A. 40A:5A-20. The LFB's finding that Bergen, in proposing dissolution of the BCUA, made adequate provision for the BCUA's creditors is supported by the record. The conclusion that Bergen has the legal authority under both N.J.S.A. 40A:5-20 and the Local Bond Law to issue such debt as may be necessary to provide adequately for the creditors is a matter within the LFB's discretion and its determination is also supported by the record. Indeed, it appears that the LFB's determination is correct whether Bergen issues fixed or variable rate debt to provide for the dissolution,[6] and regardless of whether the debt issued for that purpose is included or excluded from its debt limitation under the Local Bond Law.[7]
*416 "Our function is to enforce the legislative will as expressed by the clear language of the statute, not to presume the Legislature intended something other than what it expressed by its plain language." Howell, supra, 254 N.J. Super. at 419, 603 A.2d 959. Moreover, an agency's expertise, particularly when exercised in a specialized and complex area, is entitled to deference. See Morris County v. Skokowski, 86 N.J. 419, 424, 432 A.2d 31 (1981); Mayflower Securities Company v. Bureau of Securities in Division of Consumer Affairs, 64 N.J. 85, 92-93, 312 A.2d 497 (1973); In re City Affairs Committee of Jersey City, 129 N.J.L. 589, 591, 30 A.2d 581 (S.Ct. 1943); Howell Tp., supra, 215 N.J. Super. at 182, 521 A.2d 858; Schinck v. Board of Education of Westwood Consolidated School District, 60 N.J. Super. 448, 465, 159 A.2d 396 (App.Div. 1960). See also City of Atlantic City v. Laezza, 80 N.J. 255, 265, 403 A.2d 465 (1979), New Jersey Bell Tel. Co. v. State Dep't of Public Utilities, Board of Public Utility Commissioners, 162 N.J. Super. 60, 77, 392 A.2d 216 (App.Div. 1978).
The BCUA's arguments would have this court propose additional requirements for dissolution that are not set forth in the carefully circumscribed language of the statute. It would inappropriately require that the actual granting of certain licenses and permits to the BCIA be accomplished before the dissolution; that there be legal certainty with regard to such items as veto power and issuance of variable rate debt and Bergen's ability to deduct debt under N.J.S.A. 40A:2-7(d). Such a procedure would be putting the cart before the horse.
Here, the LFB's approval of Bergen's dissolution application is conditioned upon the BCIA or Bergen acquiring certain permits presently held by the BCUA and also upon Bergen providing for BCUA creditors. The LFB determined that Bergen made adequate provision for the assumption of services provided by the *417 BCUA, including the various steps required to effectuate the transfer of any permits or licenses. Moreover, the issuance of any debt by Bergen in connection with the BCUA's dissolution must be under the supervision of the LFB. N.J.S.A. 40A:5A-20. Thus, the LFB's approval of the dissolution application and its determination that adequate provision has been made for the assumption of the necessary services cannot be said to be arbitrary, capricious or unreasonable.
In sum, there is substantial credible evidence in the record to support the LFB's findings that Bergen has made adequate provision for payment of the BCUA's creditors and obligations in connection with the dissolution, and for Bergen's assumption of the services previously provided by the BCUA that are necessary for the health, safety, and welfare of those serviced.
Affirmed.
NOTES
[1] Bergen asserts that it instituted dissolution proceedings as a result of an investigation by the State Commission of Investigation, which "showed a long series of gross improprieties by the BCUA and recommended substantial changes in the structure, composition and conduct of the BCUA."
[2] The dissolution application triggered at least three separate law suits by the BCUA challenging various aspects of the proposed dissolution. The BCUA also sent a comprehensive April 13, 1993 letter to the LFB outlining its objections to the proposed dissolution.
[3] During the pendency of this appeal, the LFB chairman requested the OAL to refrain from action on the conflict of interest matter pending the disposition of this appeal. The OAL thereupon closed its file on the matter.
[4] No reason appears why the notice of appeal was not filed on April 21, 1993, as was jurisdictionally required for an emergent application.
[5] Even if a conflict of interest existed, absent unusual circumstances, the work product of the disqualified firm should be available to any successor firm.
[6] A recent Law Division decision resolved a challenge to the variable rate debt in Bergen's favor.
[7] It appears that even if the debt proposed to be issued by Bergen in conjunction with the BCUA dissolution was included within its debt limitation under the Local Bond Law, it would not cause Bergen to exceed that debt limitation. There is ample evidence in the record that Bergen has the financial ability, including borrowing capacity, property tax base and revenues to issue such debt as may be necessary to make adequate provision for the BCUA's creditors.